IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division


LUFTHANSA SYSTEMS INFRATEC GmbH, a
German entity,

        Plaintiff,

        v.        Civil Action No. 3:10CV745-JAG

WI-SKY INFLIGHT, INC., *et al.*,

        Defendants.


## <u>MEMORANDUM OPINION</u>

This case involves disputes over plans to develop new technology for airplanes. The various parties attempted to negotiate contracts to create, market, and purchase devices to provide wireless Internet service to airplane passengers. Their deals fell apart, and this litigation ensued.

Wi-SKY Inflight, Inc. ("Wi-SKY") has moved to dismiss both the Amended Complaint against it and a cross-claim filed by one of Wi-SKY's co-defendants, True Path Holdings, LLC ("TruePath"). For the reasons stated below, the Court denies the motions to dismiss.

### I. Facts

In March, 2008, Wi-SKY began to work on a project to improve Internet service for airline passengers. (Countercl. of Def. Wi-SKY Inflight, Inc. ¶¶ 4-5.) In November, 2008, defendant Michael Leabman formed Vivano Networks, Inc. ("Vivano") to create and produce base stations and radios designed to provide fast, broadband Internet service to passengers in planes. (Leabman Decl. ¶¶ 2, 4.) Leabman invented the technology and applied for a patent.

(TruePath Crosscl. ¶ 6.) Wi-SKY became interested in marketing Leabman's technology and entered into a contract with Leabman and Vivano. (Def. Wi-SKY Inflight, Inc.'s Br. in Supp. of Mot. to Dismiss 2.) Under the contract, Leabman agreed to serve as Wi-SKY's Chief Technology Officer, and Vivano agreed to produce equipment for the project. (*Id.*) The parties entered a written agreement called the "Contractor Confidentiality, Invention Rights, Exclusivity and Non-Compete Agreement" (the "Inventions Rights Agreement" or "IRA"). (*Id.*)

Importantly to the central dispute in this case, Wi-SKY contends that Leabman and Vivano conveyed to Wi-SKY all rights to the newly invented technology. (Wi-SKY Countercl. ¶ 11.) Leabman and Vivano contend that any transfer of the technology either did not occur or was ineffective for various reasons, including a breach of contract by Wi-SKY. (TruePath Crosscl. ¶¶ 11-14.)

In 2009, Wi-SKY began to deal with Lufthansa Systems Infratec, GmbH ("Lufthansa"), a potential buyer of the new technology. (Liebe Decl. ¶¶ 2-4.) Leabman and Vivano participated in meetings with Lufthansa representatives in which they demonstrated the technology. (Wi-SKY Countercl. ¶ 19.) The negotiations proceeded to a stage where the parties needed to share confidential information with each other in order to continue attempts to reach a final agreement. On May 6, 2010, therefore, Lufthansa and Wi-SKY entered into a confidentiality agreement related to the potential business transaction (the "Confidentiality Agreement"). (Wi-SKY Countercl. ¶ 21.) Later that month, Wi-SKY and Lufthansa entered into negotiations to complete a contract in which Lufthansa would obtain the exclusive rights to the technology in Europe, the Middle East, and North Africa. (*Id.* ¶ 22.) Leabman, however, refused to sign a written performance commitment required by Lufthansa, and the deal was terminated. (*Id.* ¶ 23.)

According to Wi-SKY, in June, 2010, Leabman and Vivano began trying to sell the technology themselves, cutting Wi-SKY out of the deal. (*Id.* ¶ 24.) At some point, they entered into negotiations with two venture capital firms, V10 Capital Partners, LLC ("V10") and Turnstone Capital Partners, LLC ("Turnstone"). (*Id.*) Wi-SKY alleges that Leabman, Vivano, V10, and Turnstone then contacted Lufthansa directly in an attempt to sell the technology. (*Id.* 26.) In response, Wi-SKY sent a cease and desist letter to Lufthansa informing it that Wi-SKY owned the technology. (Am. Compl. ¶ 41.) At oral argument, Wi-SKY's attorney admitted that the letter essentially threatened litigation if Lufthansa acquired the technology from Leabman and his new associates.

Throughout this time, Wi-SKY made a number of attempts to obtain capital to develop the technology. Many of these attempts involved Virginia firms—the same firms who teamed up with Leabman to sidestep Wi-SKY and go directly to Lufthansa. Grant Sharp, the president of Wi-SKY, first came to Richmond on March 31, 2008, to seek financing from V10. (Karides First Decl. ¶ 5.) Ultimately, on April 9, 2008, Wi-SKY signed a note to borrow $100,000 from Wi-Vest, LLC ("Wi-Vest"), a financing venture formed by the principals of V10. (*Id.* ¶¶ 8-11.) The promissory note consented to Virginia jurisdiction for any collection actions.[1] (Karides First Decl. ¶¶ 7-11.) On May 1, 2008, Sharp again visited Virginia to meet V10 for financing. (*Id.* ¶ 12.)

Other matters related to the Internet project brought Wi-SKY representatives to Richmond. On October 6, 2008, Sharp met with Lufthansa representatives in Virginia and signed a non-disclosure agreement. (*Id.* ¶ 14.) On July 13, 2010, Wi-SKY met with

---

[1] Wi-Vest has filed suit in this Court to collect sums due under the promissory note.

representatives of V10 and Wi-Vest in Richmond to discuss the ownership of the intellectual property for the technology in this case.[2]  (*Id.* ¶ 16.)

After the July 13 meeting, Wi-SKY apparently realized that Leabman and the financiers had cut it out of the deal.  On August, 27, 2010, Wi-SKY filed suit in state court in Atlanta, Georgia, against Leabman, Vivano, V10, Turnstone, and the partners in V10 and Turnstone. (Def. Wi-SKY Inflight, Inc.'s Br. in Supp. of its Mot. to Dismiss 3-4.)  The Atlanta suit alleged various contract and tort claims arising not only from the Invention Rights Agreement but also from what Wi-SKY saw as the defendants' concerted action to undermine the IRA and sabotage Wi-SKY's potential deal with Lufthansa.  (*Id.*)   Wi-SKY posted the Atlanta complaint on its website.[3]

Two weeks after the Atlanta suit was filed, an entity called True Path Holdings, LLC, was formed by Leabman, Wi-Vest, and Turnstone.  (TruePath Crosscl. ¶ 18.)  Leabman immediately assigned to TruePath all his rights to any technology that would provide broadband Internet service to planes, trains, and automobiles.  (*Id.* ¶ 19.)

## II. Current Proceedings

Lufthansa commenced this case by filing a complaint against Wi-SKY, Leabman, Vivano, V10, Turnstone, and TruePath.  Lufthansa wants to purchase the broadband technology,

---

[2] Wi-SKY contends that, in some of these meetings, Grant Sharp had on a different hat and did not serve as president of Wi-SKY.  Instead, he was representing Wi-SKY, LLC, a different corporation he also headed.  This contention rings hollow, however, because Wi-SKY, LLC had been dissolved before Grant Sharp came to Richmond, allegedly on its behalf.

[3] Originally, Lufthansa sought a preliminary injunction to compel Wi-SKY to remove the Atlanta complaint from its website.  The parties, however, have agreed that Wi-SKY would remove certain information from the website, so the motion for a preliminary injunction is moot.

and, therefore, seeks a declaratory judgment as to the ownership of Leabman's inventions.[4]  This claim involves the competing property interests of Wi-SKY, Leabman, Vivano, the financiers, and TruePath.  Lufthansa also filed claims against Wi-SKY alone.  In this respect, it asserts that Wi-SKY has violated Section 43 of the Lanham Act, 15 U.S.C. § 1125, and that Wi-SKY has breached the terms of the Confidentiality Agreement.  In these latter claims, Lufthansa seeks an award of damages.

Additionally, TruePath has filed a crossclaim against Wi-SKY in which it seeks a declaratory judgment as to the ownership of the technology.

Wi-SKY, in turn, asserts a counterclaim against Lufthansa and seeks a declaratory judgment with respect to ownership of the technology.  Wi-SKY also contends that Lufthansa conspired to cause contractual breaches and tortious interference with its business and contractual relations.  Finally, Wi-SKY asserts that Lufthansa has breached the Confidentiality Agreement.  For the conspiracy, tort, and breach of contract claims, Wi-SKY seeks monetary damages.

Wi-SKY has moved to dismiss the case for lack of subject matter jurisdiction, personal jurisdiction, and standing.  In addition, Wi-SKY contends that venue is improper in the Eastern District of Virginia.  Wi-SKY also argues that the Court should abstain from hearing the case.  Finally, Wi-SKY argues that Lufthansa has not stated a proper claim for relief under the Lanham Act.

### III. Discussion

### A. Jurisdiction and Standing

---

[4] Lufthansa raises the possibility that the Leabman technology involves intellectual property going beyond the technology that Wi-SKY owns.  This argument does not affect the motions before the Court at this time.

The Court will first address Wi-SKY's arguments concerning jurisdiction and standing, because these can dispose of the case without further review of the merits.

### 1. Subject Matter Jurisdiction

Lufthansa asserts subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1338(a) and (b). Wi-SKY notes that this case does not involve patent claims, so the Court lacks jurisdiction under 28 U.S.C. § 1338. This argument is correct but irrelevant. The Lanham Act claim arises under federal law, giving the Court federal question jurisdiction under 28 U.S.C. § 1331. In addition, it appears that the Court has diversity jurisdiction because there is complete diversity between Lufthansa and all of the Defendants, and the amount in controversy is greater than $75,000. *See* 28 U.S.C. § 1332. Wi-SKY does not contest the existence of federal question or diversity jurisdiction.[5]

The motion to dismiss for lack of subject matter jurisdiction is denied.

### 2. Personal Jurisdiction

Responding to a 12(b)(2) motion, the plaintiff bears the burden of establishing personal jurisdiction over each defendant by a preponderance of the evidence. *Mylan Labs., Inc. v. Akzo*, 2 F.3d 56, 59-60 (4th Cir. 1993). In this determination, the Court must resolve two issues: (A) whether the action falls within the ambit of Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1, and (B) whether the due process clause of the Fourteenth Amendment permits jurisdiction. *ESAB Group v. Centricut*, 126 F.3d 617, 622 (4th Cir. 1997). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." *Consulting*

---

[5] It is unclear whether Wi-SKY contends that the Court lacks subject matter jurisdiction over TruePath's crossclaim, which arises under state law. The Court has supplemental jurisdiction over TruePath's crossclaim pursuant to 28 U.S.C. § 1367(a) because TruePath's crossclaims arise from the same case or controversy as the Lanham Act claim by Lufthansa.

*Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Thus, the relevant inquiry is whether due process allows the Court to exercise personal jurisdiction over Wi-SKY.

Under the due process analysis, the Supreme Court has drawn a distinction between "specific" and "general" jurisdiction. *Vianix Del., LLC v. Nuance Commc'ns, Inc.*, 637 F. Supp. 2d 356, 361-62 (E.D. Va. 2009). To establish general jurisdiction, the plaintiff must demonstrate that a defendant's contacts with the forum are "continuous and systematic," such that the defendant should reasonably expect to face lawsuits in the forum state. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415-16 (1984). Lufthansa does not contend that this Court has general jurisdiction over Wi-SKY.

Rather, Lufthansa argues that the Court has specific jurisdiction over Wi-SKY. To establish "specific" jurisdiction, a plaintiff must demonstrate that "the defendant has purposefully directed his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and that the alleged injuries arise out of or relate to those activities." *Helicopteros*, 466 U.S. at 414 (internal quotation marks omitted). Under such circumstances, it is fair to exercise jurisdiction over the defendant, and due process is not offended.

Wi-SKY claims it does not transact business in Virginia—it has no offices, is not registered, does not own, lease, or possess property, has no bank accounts, and does not receive revenue or income from goods or services rendered in Virginia. (M. Grant Sharp Aff. ¶¶ 4-5.) According to Wi-SKY, its only contacts with Virginia consist of a few emails, one visit in 2008 to discuss an investment with V10, and approximately a dozen telephone calls made to V10 regarding the investment opportunity—none of which, Wi-SKY says, relate to the IRA, Confidentiality Agreement, or have "[any] relationship whatsoever to Plaintiff's claims." (Sharp Aff. ¶¶ 7-10.)

Lufthansa responds that the Eastern District of Virginia is central to the dispute over the ownership of the technology between Wi-SKY and TruePath, the assignee of Leabman's intellectual property rights. Contrary to Wi-SKY's contentions, Lufthansa states that Wi-SKY "consistently over a period of years sought and received the support of [V10]," and "Wi-SKY's President has repeatedly traveled to Virginia and regularly corresponds with [V10 and Wi-Vest, LLC, a V10 affiliate]." (Karides First Decl. ¶¶ 3-15.) Lufthansa also states that, on April 9, 2008, Wi-SKY and its parent, Wi-SKY Networks, LLC, executed loan documents with Wi-Vest invoking the benefits and privileges of Virginia law and consenting to jurisdiction in Virginia. (Karides First Decl. ¶¶ 7-11.) A separate action filed in this Court, *Wi-Vest, LLC v. Wi-SKY Inflight, Inc. et al.*, concerns Wi-SKY's default under these loan agreements and seeks, among other things, foreclosure on all of Wi-SKY's interest in the broadband technology. *See Wi-Vest, LLC v. Wi-SKY Inflight, Inc. et al.*, No. 3:10-CV-776 (E.D. Va. filed Oct. 26, 2010).

In addition, Lufthansa claims there is a clear causal relationship between Wi-SKY's Virginia contacts and the subject matter of the declaratory judgment claims. Lufthansa states that "without the participation of the Virginia investors, [V10 and Wi-Vest], in providing critical funding and the loan made under Virginia law, including the consent to jurisdiction in Virginia, Wi-SKY's ability to initiate and participate [with Lufthansa] would have been substantially impaired, if not totally impossible." (Pl.'s Resp. to Mot. to Dismiss 19.) Moreover, one of the initial meetings introducing Lufthansa to Wi-SKY occurred in Richmond, Virginia. (Liebe Decl. ¶ 4.) Wi-SKY's President and CEO, Grant Sharp, claims he was representing Wi-SKY, LLC, not Wi-SKY Inflight, Inc., during some of his visits and negotiations with V10 and Wi-Vest, thus those contacts are irrelevant to Wi-SKY's personal jurisdiction analysis. (Supp. Aff. M. Grant Sharp ¶¶ 4-11.) Wi-SKY, LLC is apparently a shell corporation established by Wi-SKY in

anticipation of potential investment with V10 and Wi-Vest. (Supp. Aff. Sharp ¶ 4.) Ultimately, however, Wi-SKY, LLC had been dissolved by the time of the meetings in question.

The Fourth Circuit has established a three-part test to determine the existence of specific jurisdiction:

(1) The extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state;

(2) Whether the plaintiff's claims arise out of those activities directed at the State; and

(3) Whether the exercise of personal jurisdiction would be constitutionally unreasonable.

*Consulting Eng'rs Corp.*, 561 F.3d at 278. The court also provided a number of factors to consider in determining the first prong:

(1) Whether the defendant maintains offices or owns property in the forum state;

(2) Whether the defendant reached into the forum state to solicit or initiate business;

(3) Whether the defendant deliberately engaged in significant business activities in the forum state;

(4) Whether the parties contractually agreed that the law of the forum state would govern disputes;

(5) Whether the defendant made in-person contact with a resident of the forum state regarding the business relationship;

(6) The nature, quality and extent of the parties' communications about the business being transacted; and

(7) Whether the performance of the contract was to occur within the forum.

*Id.* The "strongest factor" in determining whether business negotiations give rise to specific jurisdiction is "whether the defendant initiated the business relationship in some way." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (internal quotation marks and citation omitted).

In this case, it is undisputed that Wi-SKY reached into Virginia to solicit financing from V10 and Wi-Vest for the development of its air-to-ground communication business. During oral argument, counsel for Wi-SKY even noted that the April 9, 2008 loan agreement with Wi-Vest was executed in furtherance and anticipation of the business deal with Lufthansa that underlies this case. Between March 31, 2008 and July 13, 2010, Wi-SKY CEO Grant Sharp traveled to Richmond four times to negotiate financing with V10 and Wi-Vest, to meet in-person with Lufthansa representatives to discuss their business deal, and to address investor concerns over the dispute concerning the technology's ownership. The Court, therefore, finds that Wi-SKY has purposefully availed itself of the privilege of conducting business in Virginia—Wi-SKY actively pursued financing options in the Commonwealth, eventually signed a loan contract in Virginia with Wi-Vest, and personally met with Lufthansa in Virginia to discuss their business relationship.

Furthermore, Wi-SKY's Virginia contacts are necessarily entangled with Lufthansa's instant claims. All three claims arise out of the business relationship between Wi-SKY and Lufthansa to provide the broadband technology for use in airplanes owned by Lufthansa's parent companies. In other words, the financing received by Wi-SKY in the Commonwealth was purposefully obtained to fund the Lufthansa-Wi-SKY business deal that forms the basis of this suit. *See Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1128 (4th Cir. 1986) (one factor a court must consider in determining minimum contacts is defendant's "prior negotiations and contemplated future consequences . . ." (quoting *Burger King Corp. v. Rudzewicz*, 105 S. Ct. 2174, 2186 (U.S. 1985))). Thus, this case meets the criteria for a suit arising from dealings in this state.

Finally, the Court finds that the exercise of personal jurisdiction over Wi-SKY would not be constitutionally unreasonable. The integral question is whether the litigation is "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009) (internal quotation marks and citation omitted). Such a severe disadvantage is not present in this case. The Commonwealth has a significant interest in providing an efficient resolution to a dispute involving parties who have negotiated and developed a business relationship in Virginia, *Message Sys. v. Integrated Broadband Servs., LLC*, 2010 U.S. Dist. LEXIS 72559, at *18 (D. Md. July 19, 2010) (defendant's initiation of a business relationship with a Maryland company favors the assertion of personal jurisdiction in Maryland), and the burden on a corporation such as Wi-SKY to litigate in this Court is relatively minor. *See Dash v. Mayweather*, 2010 U.S. Dist. LEXIS 87842, at *12 (D.S.C. Aug. 25, 2010) (finding that litigation in foreign state was no great burden considering defendants' financial resources and ability to secure a large, national law firm for representation). Indeed, Wi-SKY is engaged in Virginia litigation over its default on a promissory note. Given the steps that Wi-SKY took in Virginia to facilitate the Lufthansa transaction, it is fair to subject Wi-SKY to the jurisdiction of courts in this state.

In conclusion, the Court finds that it may exercise personal jurisdiction over Defendant Wi-SKY.[6]

### 3. Standing

---

[6] The Court's analysis has focused on Lufthansa's claim against Wi-SKY. The same logic leads the Court to conclude that personal jurisdiction over Wi-SKY is proper in the crossclaim action by TruePath as well.

Under Article III of the Constitution, a federal court's power to entertain a suit is limited to the adjudication of actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see Warth v. Seldin*, 422 U.S. 490, 498 (1975). The "case or controversy" requirement properly limits the role of courts in our democratic society and defines, with respect to the Judicial Branch, the idea of separation of powers on which the Federal Government is founded. *Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471-476 (1982)). As such, "the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process," and, therefore, meet the requirements of Article III. *Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990); *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009). Without the existence of a case or controversy, this Court has no jurisdiction over the matter in question.

In *Allen*, the Supreme Court recognized that the doctrine of standing has two components—one prudential, and one jurisdictional. *See Allen v. Wright*, 468 U.S. at 751. The prudential component involves the exercise of self-imposed restraints over a court's exercise of its jurisdiction, "such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen*, 468 U.S. at 751 (citing *Valley Forge*, 454 U.S. at 474-75); *see Bishop*, 575 F.3d at 424 ("With regard to the prudential component of standing, courts generally recognize three self-imposed constraints.").

To satisfy the constitutional component, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3)

it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The party invoking federal jurisdiction bears the burden of establishing these elements and must do so "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561; *see Stephens v. County of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and alteration omitted); *see McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936).

A plaintiff need not "await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982); *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010). When prospective, declaratory relief is sought, a federal court may properly exercise jurisdiction when three essentials are met: (1) the complaint alleges an "actual controversy" between the parties; (2) the court possesses an independent basis for jurisdiction over the parties (*e.g.*, federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction. 28 U.S.C. § 2201 (2010); *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994); *N. Jefferson Square Assocs. v. Virginia Hous. Dev. Auth.*, 94 F. Supp. 2d 709, 714 (E.D. Va. 2000). In determining the existence of an actual controversy, the facts must show "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *Md. Cas. Co. v.*

*Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *Arbitrationchampions.com v. Councilors of the N.C. State Bar*, 2007 U.S. Dist. LEXIS 85125, at \*4-6 (M.D.N.C. Nov. 16, 2007).

Generally, a party does not possess standing to bring a declaratory judgment claim regarding rights and obligations under a contract to which it is neither a party nor a third-party beneficiary. *Grondal v. United States*, 682 F. Supp. 2d 1203, 1220 (E.D. Wash. 2010); *see Mardian Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 2456214, at \*5-6 (D.Ariz. 2006) (not reported) (plaintiff lacked standing to bring declaratory judgment claim against insurer concerning the meaning of a policy to which it was not a party or third party beneficiary). *But see Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (privity of contract was not necessary because the threat of suit was enough to create standing since a threatened party may seek a declaration that the threatening party's putative rights are invalid). The Fourth Circuit, however, has held that a specific threat of litigation may be sufficient to give rise to a case or controversy in certain circumstances. *Arbitrationchampions.com*, 2007 U.S. Dist. LEXIS 85125, at \*5 (citing *Volvo Const. Equip. N. Am. Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593 n.12 (4th Cir. 2004) (noting that "the initiation of litigation against Volvo and the threats of future litigation" were sufficient to constitute a controversy for purposes of the Declaratory Judgment Act)); *see GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563 (11th Cir. 1995) (holding that threat of future litigation gives rise to actual controversy).

Wi-SKY argues that Lufthansa seeks a declaration of ownership rights under an agreement to which it is neither a party nor a third-party beneficiary, *i.e.* the Invention Rights Agreement; it contends, therefore, that Lufthansa lacks standing to bring its declaratory judgment

action.  Wi-SKY believes that, for financial reasons, Lufthansa framed this action to circumvent the Georgia suit and gain a more prompt answer to the technology's ownership.

Conversely, Lufthansa contends that the Georgia suit fails to resolve the exact issue raised in its declaratory judgment action.  It claims the issue presented in this case is "not only whether Wi-SKY has any rights in broadband wireless communications technology for commercial aircraft that may have been developed under its Invention Rights Agreement (the subject of the Georgia suit), but also whether any of the technology in which it may have rights is currently being used by TruePath for the installation in Lufthansa aircraft."  (Pl.'s Resp. to Def. Wi-SKY Inflight, Inc.'s Mot. to Dismiss 5-6.)  Moreover, Lufthansa argues that future litigation is a real threat without a determination on its instant claim, as evidenced by the cease and desist letter it received from Wi-SKY on September 30, 2010 (the "September 30, 2010 Letter").  (Pl.'s Resp. 4-5.)  Finally, Lufthansa argues that, because of its need to maintain a competitive advantage over other commercial airlines with respect to the broadband technology, the threat that Wi-SKY's demands and claims will cause substantial damage to Lufthansa is of "sufficient immediacy."  (Pl.'s Resp. 5.)

Lufthansa raises a legitimate question as to whether the technology at issue in the Georgia suit is different from the technology which Lufthansa seeks and TruePath claims ownership.  As a result, Wi-SKY's claim that Lufthansa seeks a determination of the rights set forth in the IRA is partially incorrect.  While Lufthansa may be concerned with the ownership of the IRA technology, it also seeks clarification as to whether the technology assigned to TruePath is wholly identical and encompassed by the IRA technology.  Therefore, Lufthansa is not requesting a determination of rights under an agreement to which it is not a party.  Rather, it seeks a declaration of ownership rights with respect to the technology assigned to TruePath—

technology Lufthansa proposes to purchase, and over which Wi-SKY has threatened legal action. The fact that Lufthansa and TruePath are not parties to the Georgia suit increases the likelihood that a judgment in that case will fail to determine all of the claims raised by Lufthansa in the present action. *See NUCOR Corp. v. Aceros y Maquilas de Occidente*, 28 F.3d 572, 577 (7th Cir. 1994) (purpose of Declaratory Judgment Act is to avoid accrual of avoidable damages to party uncertain of its rights).

Lufthansa will also suffer an imminent "injury in fact" if it continues to negotiate for the technology without Wi-SKY, and such injury can be directly traced to Wi-SKY's past conduct and threatened actions. Wi-SKY's letters to Lufthansa clearly constitute a threat of future litigation. The letter states: "We ask that you immediately cease any such discussions and/or negotiations [with Leabman, Vivano, and TruePath] until a court has determined the validity of Michael Leabman's and Vivano's claims of ownership of the disputed property." (September 30, 2010 Letter 1-2.) The purpose of the letter is clear—prevent Lufthansa from negotiating for the technology without Wi-SKY by threatening future legal ramifications. The Court, therefore, finds that an actual controversy exists between Lufthansa and Wi-SKY, and Lufthansa has standing to bring its declaratory judgment action.

Wi-SKY employs a similar strategy to argue that TruePath lacks standing to bring its declaratory judgment action. TruePath, like Lufthansa, is neither a party nor third-party beneficiary of the IRA. Wi-SKY argues that TruePath does not face the requisite "threat of liability" that would allow a declaratory judgment action to proceed. Wi-SKY also argues that the Georgia suit focuses on the identical rights raised in TruePath's declaratory judgment claim, noting that TruePath's interest in the technology "absolutely depends on an interpretation of the

Invention Rights Agreement." (Def. Wi-SKY's Reply Br. Supp. of Mot. to Dismiss Cross-cls. 2.)

In response, TruePath argues that it will suffer injury absent declaratory relief—specifically, the threat of litigation over the broadband technology. Both TruePath and Wi-SKY assert ownership over the technology—TruePath, as the assignee of Leabman, and Wi-SKY under the IRA. TruePath's concerns with the ownership of the technology are similar to Lufthansa's. TruePath, like Lufthansa, seeks not only a determination of the technology but also a clarification as to whether the technology assigned to it by Leabman is, in fact, wholly identical to the IRA technology. Therefore, TruePath is not seeking a determination of rights under an agreement to which it is not a party. Rather, like Lufthansa, it is requesting a declaration of ownership rights with respect to the technology assigned to it.

Wi-SKY has already brought claims against Turnstone and V10 for allegedly interfering with Leabman's and Vivano's performance under the IRA. (Wi-SKY Ga. Compl. ¶¶ 85-93; Wi-SKY's Mot. to Dismiss Ex. B.) Moreover, Wi-SKY has allegedly moved to join TruePath in the Georgia dispute, clearly demonstrating an imminent threat of litigation. (Resp. to Wi-SKY's Mot. to Dismiss Cross-cls. 9.)

For these reasons, the Court finds that TruePath has standing to pursue its declaratory judgment claim.

### B. Venue

The relevant venue provision in this case, 28 U.S.C. § 1391(b), states:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in:

(1)      A judicial district where any defendant resides, if all defendants reside in the same State;

(2)     A judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3)     A judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b) (2010).

Wi-SKY argues that subsection (b)(2) should apply; therefore, venue in this District is improper for two reasons: (1) none of the events giving rise to Lufthansa's claims, including the claim for violations of the Lanham Act and breach of the Confidentiality Agreement, occurred in Virginia; and (2) the forum selection clause of the Invention Rights Agreement is mandatory, enforceable, and names Georgia as the proper venue.

In this case, all of the corporate and unincorporated-association defendants are considered residents of Virginia because they were subject to personal jurisdiction in this District at the time suit was filed.  28 U.S.C. § 1391(c) (2010).  The only individual defendant, Leabman, has consented to personal jurisdiction and venue in this Court.  (Am. Compl. ¶ 3.); *see Indus. Addition Ass'n. v. Commissioner*, 323 U.S. 310, 313-314 (1945) (venue may be cured by consent of the parties).  Thus, subsection (b)(1) applies, and venue is proper in this case.  Furthermore, Wi-SKY's argument that the IRA's forum selection clause applies in this case is unfounded. Lufthansa has never been a party to the IRA and is not controlled by its terms.  *See State Farm Fire & Cas. Co. v. Nationwide Mut. Ins. Co.*, 596 F. Supp. 2d 940, 946 (E.D. Va. 2009) (generally, a person is not bound by a contract to which he did not agree); *Bishop v. Med. Facilities of Am. XLVII(47), Ltd. P'ship*, 65 Va. Cir. 187, 192 (2004).

This same analysis applies to the crossclaim by TruePath.  Because all Defendants reside in Virginia for purposes of the venue statute and the forum selection clause is inapplicable to TruePath, venue in this District is proper.

## C. Abstention

Abstention from the exercise of federal jurisdiction is the exception, not the rule. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Despite what may appear as the duplication of judicial resources, "[t]he rule is well recognized that the pendency of an action in the state [system] is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *McLaughlin v. United Va. Bank*, 955 F.2d 930, 934 (4th Cir. 1992) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)) (internal quotation marks omitted). According to the Fourth Circuit, "[f]ederal courts have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not." *Chase Brexton Health Services, Inc., v. Maryland*, 411 F.3d 457, 462 (4th Cir. 2005). In the words of the Supreme Court, the abstention doctrine is "an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it[,]" and "[a]bdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959); *see Colorado River*, 424 U.S. at 813. "These exceptional circumstances inevitably relate to a policy of avoiding unnecessary constitutional decisions and of accommodating federal-state relations." *Chase Brexton*, 411 F.3d at 462 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)) (internal quotation marks omitted).

Wi-SKY argues that the *Younger* doctrine and, in the alternative, the *Wilton* doctrine impel this Court to abstain from hearing the present action. The Court finds that neither is proper in this case. The *Younger* doctrine cautions against federal intervention in ongoing state criminal and administrative proceedings. *Younger v. Harris*, 401 U.S. 37, 44 (1971) ("comity[] . . . is . . .

a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.").  Although its reach has been extended to non-criminal proceedings, the present action is distinguishable because a governmental entity is not a party and Georgia's interest in deciding matters concerning privately-owned intellectual property is weak.  *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) (holding that the *Younger* doctrine applies to civil proceedings that are more akin to criminal prosecutions).

The *Wilton* doctrine gives federal courts greater latitude to abstain in cases brought for declaratory relief.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288-90 (1995).  The rule does not apply to Lufthansa's claims, however, because *Wilton* pertains only to actions solely brought for declaratory relief, not actions involving claims (such as those here) for damages or injunctive relief.  *See Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 211 (4th Cir. 2006).

According to *Colorado River*, federal courts in their discretion may abstain out of deference to a pending state court proceeding "for reasons of wise judicial administration."  *Colorado River*, 424 U.S. at 814, 818 (abstention is proper only "under exceptional circumstances").  The threshold question in determining the doctrine's application is whether parallel federal and state suits exist.  *Chase Brexton*, 411 F.3d at 463.  If parallel suits exist, then a court must carefully balance several factors "with the balance heavily weighted in favor of the exercise of jurisdiction."  *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073-79 (4th Cir. 1991).  In a court's final analysis, abstention may be considered only

when "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone*, 460 U.S. at 28.

In this case, the federal plaintiff is not a party to the pending state action in Georgia; thus, to abstain in favor of the Georgia suit would deprive Lufthansa of the opportunity to protect its rights through litigation. *See Great Am.*, 468 F.3d at 208 (declining abstention where the federal plaintiff was not a party to the state action). As the Fourth Circuit noted in *Chase Brexton*, "suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Chase Brexton*, 411 F.3d at 464 (internal quotation marks omitted). Lufthansa's absence from the Georgia suit means the two lawsuits are not parallel. Considering that abstention should only occur under exceptional circumstances where parallel suits involve substantially similar parties and issues, the Court finds that this case is not so exceptional, nor does it involve substantially the same parties. Therefore, the Court declines to abstain from hearing Lufthansa's claims.

TruePath seeks only a declaratory judgment as to the ownership of the broadband technology. When a party seeks only declaratory relief, the *Wilton* standard applies. The Court must consider the following factors in deciding whether to proceed with a federal declaratory judgment action:

    (1)    Whether the state has a strong interest in having the issues decided in its courts;

    (2)    Whether the state court could resolve the issues more efficiently than the federal court;

    (3)    Whether the presence of overlapping issues of fact or law might create unnecessary entanglement between the state and federal court; and

    (4)    Whether the federal action is mere procedural fencing in the sense that the action is merely the product of forum shopping.

*Great Am.*, 468 F.3d at 211 (4th Cir. 2006) (citing *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994)).

The first factor, whether the state has a strong issue in deciding the issue, favors abstention for questions of state law that are "difficult, complex, or unsettled." *Id.* (citing *Nautilus Ins. Co.*, 15 F.3d at 378). TruePath's claim addresses the ownership of intellectual property rights among private companies. Georgia has no strong interest in deciding this issue.

The second factor addresses "'whether the questions in controversy between the parties to the federal suit . . . can better be settled in the proceeding[s]' that are already 'pending in the state court[s].'" *Id.* at 411 (quoting *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942)). All necessary parties have been named in the action before this Court. In contrast, although Wi-SKY may have moved to add TruePath and Lufthansa to the Georgia suit, it is unclear whether the Georgia state court will have jurisdiction over them.

Neither the third nor fourth factors counsel toward abstention. The claims that may be brought in the federal and state court actions are not identical. Moreover, the fourth factor addresses those situations in which "a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum." *Id.* In this case, Lufthansa, not TruePath, initiated the lawsuit before this Court, so TruePath is not racing away from Georgia litigation to which it is already a party. Thus, the Count declines to abstain from hearing TruePath's crossclaim.

### D. Lanham Act

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts of the case, the merits of a claim, or the applicability of any defense. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering

the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254-55 (W.D. Va. 2001). To survive a motion to dismiss, a complaint must contain sufficient factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* It requires the plaintiff to articulate facts that, when accepted as true, show the "plausibility of 'entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 557). Although the Court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

Section 43(a) of the Lanham Act provides a federal remedy against a person who uses, in commerce, a false designation of origin, or any false description or representation, in connection with any goods or services. 15 U.S.C. § 1125(a) (2010); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003). A plaintiff asserting a false advertising claim under the Lanham Act must establish that:

(1)    The defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

(2)    The misrepresentation is material, in that it is likely to influence the purchasing decision;

(3)    The misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

<div style="margin-left: 2em;">

(4)     The defendant placed the false or misleading statement in interstate commerce; and

(5)     The plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

</div>

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002); *see* 15 U.S.C. § 1125(a)(1)(B) (2010). [7]

Wi-SKY seeks dismissal of the false advertising claim because of Lufthansa's failure to allege: (1) that Wi-SKY's statements were made in a "commercial advertisement;" (2) that Wi-SKY made a "misrepresentation" by posting information regarding the Georgia suit on its website; (3) that Wi-SKY's statements would influence a consumer's purchasing decision; and (4) that Wi-SKY's act of posting the Georgia complaint on its website occurred "in commerce."

Despite these arguments, Lufthansa's Amended Complaint clearly articulates sufficient factual matter to demonstrate a "plausibility of entitlement to relief." Taking all of the alleged facts as true, the Amended Complaint states that Wi-SKY made false statements and representations on the investor relations section of its public website concerning a business relationship between itself and Lufthansa. (Am. Compl. ¶¶ 28-29.) Moreover, it states that such false statements and representations generated confusion and deception concerning a portion of

---

[7] Section 43(a)(1)(B) of the Lanham Act states:

<div style="margin-left: 2em;">

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

<div style="margin-left: 2em;">

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

</div>
</div>

15 U.S.C. § 1125(a)(1)(B) (2010).

Lufthansa's business practices, thereby resulting in injury to Lufthansa's commercial interests. (*Id.* ¶¶ 30-34.)  Further details concerning the nature of Wi-SKY's misrepresentations or the extent of Lufthansa's injuries are unnecessary.  The Court, therefore, finds that Lufthansa's Amended Complaint states necessary facts to establish a plausible claim for false advertising under the Lanham Act.

## IV. Conclusion

For the reasons stated herein, the motions to dismiss filed by Defendant Wi-SKY are DENIED.  An appropriate Order shall issue.

It is so ORDERED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.


_____/s/_____
JOHN A. GIBNEY, JR.
UNITED STATES DISTRICT JUDGE


Date: <u>March 9, 2011</u>
Richmond, VA