IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division


LUFTHANSA SYSTEMS INFRATEC GmbH, a
German entity,
                    Plaintiff,

v.                                                      Civil Action No. 3:10cv745-JAG

WI-SKY INFLIGHT, INC., *et al.*,
                    Defendants.

## MEMORANDUM OPINION

The essence of this case is a familiar one: a business deal soured by funding problems during an economic recession. At its inception, the deal was marked by optimism and cooperation between the parties. Negotiations culminated in the Contractor Confidentiality, Invention Rights, Exclusivity and Non-Compete Agreement (the "Invention Rights Agreement," "IRA," or "Agreement"), a written contract that focused too heavily on future profit margins from a revolutionary product not yet in existence.

Fundamentally, the Invention Rights Agreement encompassed a joint venture between an inventor/developer and backing company. Wi-Sky Inflight, Inc. ("Wi-Sky"), the capital provider, contracted with inventor-Michael Leabman (and his company, Vivano Networks, Inc. ("Vivano")) to utilize his expertise in the creation of a functional and FAA-approved mechanism to provide high-speed internet access to airplane passengers. Leabman had the design concept and developmental knowledge; Wi-Sky provided initial consideration and promised future payments once a commercially-viable product was formed. Over time, however, Wi-Sky experienced difficulties subsidizing the project, and Leabman eventually backed out.

The instant litigation centers on what Leabman transferred when he signed the Agreement. Wi-Sky claims it purchased Leabman's intellectual property, inventions, and all related patents (or patents pending). Leabman and Vivano disagree. They claim the IRA's explicit language is forward-looking and grants ownership only for those concepts and inventions created by Leabman *for* Wi-Sky *after* the Agreement's signing.

This matter is currently before the Court on a number of motions filed by the parties in the case. The plaintiff, Lufthansa Systems Infratec, GmbH ("Lufthansa"), and one of the defendants, True Path Holdings, LLC[1] ("True Path"), have filed motions for summary judgment on the enforceability of the Invention Rights Agreement. Notably, Lufthansa and True Path's interests are aligned in this case—they both seek to have the Agreement voided or, alternatively, a declaratory judgment granting ownership of Leabman's previously-created concepts and inventions to True Path.[2]

Holding the opposite interest in this case is Wi-Sky, who seeks enforcement of the Agreement. The company also petitions the Court for a declaration that it owns all of Leabman's intellectual property and inventions related to air-to-ground, broadband internet communication. Wi-Sky has filed two motions related to discovery that are currently pending: (1) a motion for entry of a new scheduling order, and (2) a motion for an extension to complete discovery under Federal Rule of Civil Procedure 56(d). Ostensibly, Wi-Sky aims to recover information or

---

[1] In September 2010, Leabman assigned all of the ownership rights to his intellectual property and inventions to True Path. Leabman is also the President of Vivano; therefore, the three parties are virtually interchangeable given the subject matter before the Court.

[2] The Court is authorized to grant the requested relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

documents pertaining to the IRA's formation that supports their enforceability argument.[3] Wi-Sky acknowledges, however, that additional discovery is unnecessary if the Court finds the Agreement enforceable. (*See* Wi-Sky Mem. in Supp. Ext. to Complete Disc. (Dk. No. 199) 3 (recognizing that on the "narrow issue" of "[w]ho owned the technology under the language of the IRA . . . extensive discovery was not required.").)

For the following reasons, the Court finds that the Invention Rights Agreement is an enforceable contract. The summary judgment motions filed by Lufthansa and True Path must be denied as a result. Wi-Sky's discovery motions must also be denied since they were filed for the purpose of extending the discovery period if the Agreement was deemed unenforceable.

After extensive and careful deliberation, however, the Court concurs with Lufthansa and True Path's interpretation of the IRA. The contract language is clear and explicit: Wi-Sky only paid Leabman to build a marketable, finished product for its benefit using his sophisticated design concept. In other words, Leabman did not forfeit the rights to his own prior inventions and intellectual property by signing the Agreement. Rather, he agreed to buy into Wi-Sky, assume the position of Chief Technology Officer, and create a final product for the company. Along the way, "inventions" would be made and new design concepts would be developed—all of which would become the property of the funding company, Wi-Sky. To hold differently would defeat the clear language and true essence of the Agreement.

## I. BACKGROUND

This case involves disputes over plans to develop new technology for airplanes. The various parties attempted to negotiate contracts to create, market, and purchase devices to

---

[3] Also before the Court are two additional motions filed by Wi-Sky: (1) a motion to dismiss True Path's crossclaim (Dk. No. 211), and (2) a motion to change venue, sever, and stay the case (Dk. No. 223).

provide high-speed internet service to airplane passengers. Their deals fell apart, and litigation ensued.

The plaintiff in this case is Lufthansa, a German corporation with an interest in purchasing technology to transmit wireless internet signals, known as Wi-Fi, to airplanes. The primary defendant, Wi-Sky, is a Delaware corporation formed to develop and market Wi-Fi for airplanes. Michael Leabman, another defendant, is an inventor-engineer who developed a design concept and accompanying technology for the transmission of high-speed Wi-Fi to moving aircraft as well as other modes of transportation (the "Technology"). Defendant Vivano is a Delaware corporation organized by Leabman to serve as a vehicle in the development of his Wi-Fi Technology. True Path is a limited liability company to which Leabman eventually transferred his rights in the Technology following Wi-Sky's filing of a lawsuit against Leabman and others in Georgia state court (the "Atlanta suit"). Defendants V10 Capital Partners, LLC ("V10") and Turnstone Capital Partners, LLC ("Turnstone") are entities that provided or were approached to provide financing to Wi-Sky and Leabman in their joint venture to develop the Technology.

In March 2008, Wi-Sky began to work on a project to improve internet service for airline passengers. By November 2008, Michael Leabman, an electrical engineer, had formed Vivano to produce ground-based "base stations" and radios/"mobile clients" designed to provide broadband Wi-Fi to passengers in planes, boats, cars, and trains. Leabman designed and constructed a ground-to-air communication system in 2008 while at his former company, Data Runway. In early 2008, he filed a provisional United States patent application for this system, Serial No. 61/025,219. Around that time, Wi-Sky became interested in marketing Leabman's

Technology and entered into the Invention Rights Agreement.[4] Leabman thereby agreed to serve

as Wi-Sky's Chief Technology Officer ("CTO"), and Vivano agreed to produce equipment for

the project.[5] Wi-Sky, in turn, would provide the necessary capital for raw materials and testing

to generate a marketable product.[6] Notably, Grant Sharp, Wi-Sky's CEO and President, initially

utilized a boilerplate form downloaded from <www.RealDealDocs.com> as a template for the

IRA. Without the assistance of an attorney, the parties then collaborated to alter the template to

---

[4] Pursuant to paragraph 13 of the IRA, the Court will apply Georgia law on matters of contract formation and interpretation. As stated from the bench on March 16, 2011, this Court is a proper forum despite the IRA's directive that any disputes over the contract be resolved by state or federal courts in Georgia. Lufthansa and True Path are not parties to the Invention Rights Agreement; therefore, they are not in privity with Wi-Sky, and Lufthansa and True Path cannot be bound by the IRA's choice of law provision. For these reasons, the Court will deny Wi-Sky's amended motion to dismiss True Path's crossclaim (Dk. No. 211) and motion to sever and stay, and transfer venue (Dk. No. 223).

[5] Notably, paragraph 7 of the IRA states:

> 7. EXCLUSIVITY. In exchange for Contractor's covenants herein, and in addition to equity of Contractor granted to WI-SKY for funding of non-recurring engineering and other startup costs of Contractor, WI-SKY agrees to use Contractor as the sole source supplier for base station and aircraft radios used in conjunction with WI-SKY's business mission. In addition, Contractor agrees to sell, whether direct sales or indirectly via an OEM, any and all ground-air-ground radio equipment developed and produced by Contractor solely and exclusively to WI-SKY.

(Invention Rights Agreement (Dk. No. 212, Ex. A) ¶ 7.)

[6] The technical details of the final product are sophisticated, yet irrelevant, to the Court's current decision. As the Court understands it, Leabman developed an elaborate concept for the construction of a two-part mechanism for transmitting the high-speed internet signal. Ground-based stations would effectively deliver the signal to a separate "black box" radio in the moving aircraft, thereupon providing wireless internet access to the plane passengers, including pilots and staff.

the specific terms of their business deal. The Court finds that Wi-Sky and Leabman/Vivano are equally responsible for the drafting of the Invention Rights Agreement.[7]

The Agreement was signed by Grant Sharp as representative of Wi-Sky on January 27, 2009; by Vivano, through Leabman, on January 28, 2009; and by Leabman himself, on the same date, January 28, 2009. Paragraph 1 of the IRA recites the consideration: 50,000 shares of Wi-Sky stock was transferred from Wi-Sky to Leabman/Vivano.[8]   There was additional consideration: Wi-Sky was required to pay certain sums of money to Leabman and Vivano over various time periods outlined in Appendix A to the Agreement.[9]   (IRA (Dk. No. 212, Ex. A), App. A.)   In exchange, Leabman and Vivano were obligated to develop his ground-to-air communication system to commercial viability.

The crux of this case is the proper interpretation of paragraph 5 of the IRA, specifically the transfer of inventions and intellectual property from Leabman to Wi-Sky. The relevant portions of paragraph 5 state:

---

[7] Ordinarily, Georgia law provides that any ambiguities should be resolved against the drafter of the contract. *See Kennedy v. Brand Banking*, 245 Ga. 496, 500 (1980).

[8] Paragraph 1 of the IRA states: "Consideration as compensation and payment for the efforts and convenants of both parties to this Agreement, shall be in the form of cash, stock and other binding obligations and commitments as set forth herein . . . ." (IRA ¶ 1.)

[9] Leabman eventually received a total of 200,000 shares upon the signing of the Common Stock Agreement and Term Sheet. Conflicting evidence exists as to what the value of a share of Wi-Sky stock was worth at the time of the IRA's execution. Regardless, the Court finds that Leabman's 200,000 shares were worth at least $900,000.00 at the time of the transfer.

Leabman claims that the shares were subject to a lock-up agreement that made them illiquid. They argue that the 200,000 shares constituted illusory consideration and, therefore, the Agreement should be held unenforceable. The Court disagrees. Leabman was aware of the nature of the shares when he signed the IRA; he agreed to accept the shares in lieu of cash. The Court finds that the Agreement provided for adequate consideration in this case. These individuals and entities must be held responsible for the contracts to which they bound themselves. The lock-up limitation was voluntarily signed by Leabman and Vivano because they wanted the deal to proceed.

THE PROVISIONS OF THIS SECTION (5) APPLY ONLY TO WORK OF [sic] EFFORT DONE BY CONTRACTOR **PERTAINING TO THE UNIQUE APPLICATION FOR GROUND-TO-AIR COMMUNICATION, FOR THE BENEFIT OF AND PAID FOR BY WI-SKY.** THE PROVISIONS OF THIS SECTION DO NOT APPLY TO WORK OF CONTRACTOR THAT DO NOT PERTAIN TO, RELATE TO, APPLY TO, OR BENEFIT THE GROUND-TO-AIR COMMUNICATION MISSION OF WI-SKY.

(a) Contractor shall promptly, from time to time, fully inform and disclose to Wi-SKY in writing or discussion all inventions, proprietary ideas, copyrightable material, designs, improvements and discoveries of **any kind whether hardware or software which Contractor now has made, conceived or developed, or which Contractor may later make, conceive or develop, during the period of Contractor's engagement with Wi-SKY, which pertain to, relate to or benefit Wi-SKY's business, inflight communication mission, patents, patents pending or business model or any of the work or businesses carried on by Wi-SKY (hereinafter defined as "Inventions").** This Agreement applies to all such Inventions, whether or not they are eligible for patent, copyright, trademark, trade secret or other legal protection; and whether or not they are conceived and/or developed by Contractor alone or with others; and whether or not they are conceived and/or developed during regular working hours; and whether or not they are conceived and/or developed at Wi-SKY's facility or nor, for the benefit and use of Wi-SKY.   Inventions expressly excludes radio chips, components, processes, or applications

(b) Inventions as defined herein, and subject to the obligation timetable set forth in Appendix A, shall be the sole and exclusive property of Wi-SKY, and shall be deemed part of the Confidential Information of Wi-SKY for the purposes of this Agreement, whether or not fixed in a tangible medium of expression. **Contractor hereby assigns all Contractor's rights in all Inventions and in all related patents, copyrights and trademarks, trade secrets and other proprietary rights therein to Wi-SKY.** Without limiting the foregoing, Contractor agrees that any copyrightable material shall be deemed to be "works made for hire" and that Wi-SKY shall be deemed the author of such works under the United States Copyright Act, provided that in the event and to the extent such works are determined not to constitute "works made for hire", Contractor hereby irrevocably assigns and transfers to Wi-SKY all right, title and interest in such works, subject to the obligation timetable set forth in Appendix A . . .

(IRA ¶ 5(a)-(b) (emphasis added).)   Appendix B to the Agreement provided examples of the types of intellectual property funded by Wi-Sky that pertain to its mission of in-flight communication and were its exclusive property:

a. Base station antenna configuration customized for vertical azimuth, power allocation, sector coverage for maximum sky coverage and ease of deployment;

7

b. Multi-antenna design for aircraft radio to accomplish null steering and power optimization at jet speed;

c. Unique power distribution system to allocate radio frequency to antenna segments for maximum signal range and distance for aircraft line-of-sight application;

d. Custom MAC software modifications to vendor-supplied radio component, both base station and aircraft units, to accommodate connectivity at jet speed and extreme distances;

e. Radio software modifications and custom beam forming on both ends to accommodate unique interchange of dual-transmit, bi-directional signal transmission for enhanced throughput to moving aircraft;

f. Vendor's FPGA hardware components converted to ASIC chipsets to minimize size and weight for aircraft units and to substantially reduce unit cost.

(IRA ¶ 5(f), App. B.) Throughout this litigation, Wi-Sky has argued that the Agreement explicitly provides for the conveyance of all of Leabman's rights to the ground-to-air Technology, including past concepts/inventions as well as future creations. Leabman and Vivano contend that any transfer of Leabman's past inventions and intellectual property either did not occur or was ineffective for various reasons, including a breach of contract by Wi-Sky.

After the IRA's execution, Wi-Sky began negotiations to provide Lufthansa with the Wi-Fi Technology for use in its airplanes. As this relationship progressed, the two sides determined that certain aspects of their business dealings needed to be kept confidential. On July 16, 2009, therefore, Lufthansa and Wi-Sky entered into a confidentiality agreement (the "Confidentiality Agreement") that prohibited either party from disclosing any proprietary information or business plan discussed during their negotiations, or from soliciting the other's employees.

Eventually, the deal between the parties fell apart. Wi-Sky had significant trouble securing financing for the project which led to strained relations between Leabman, Wi-Sky, and Lufthansa. Thereafter, Leabman began negotiating with Lufthansa directly using different financiers, V10 and Turnstone. Wi-Sky was alerted to Leabman's actions and threatened

Lufthansa with suit.[10]  Wi-Sky later posted copies of court documents from the Atlanta suit on its

website.  In doing so, Lufthansa contends that Wi-Sky breached the Confidentiality Agreement.

Finally, after the filing of the Atlanta suit, Leabman signed documents transferring his ownership

in the Wi-Fi Technology to a new limited liability company, True Path.

## II. PROCEDURAL HISTORY

On October 15, 2010, Lufthansa filed its original complaint for injunctive and declaratory

relief against defendants Wi-Sky, Leabman, Vivano, Turnstone, and V10.[11]  Although not a party

to the IRA, Lufthansa primarily sought a ruling from this Court as to the ownership of the

broadband-internet Technology at issue.  Lufthansa also filed claims against Wi-Sky alone.  In

this respect, it asserted that Wi-Sky violated Section 43 of the Lanham Act, 15 U.S.C. § 1125,

and that Wi-Sky breached the terms of the Confidentiality Agreement.  In these latter claims,

Lufthansa seeks an award of damages.

Additionally, True Path filed a crossclaim against Wi-Sky seeking a declaratory judgment

as to the ownership of the Technology.[12]  (*See* Dk. Nos. 15, 77, 192.)

Wi-Sky, in turn, asserted various counterclaims against Lufthansa and also sought a

declaratory judgment with respect to the Technology's ownership.  (*See* Dk. Nos. 74, 193.)  It

---

[10] The Atlanta suit is currently pending and seeks to resolve many of the instant issues before this Court.  According to the parties, that litigation has been stayed pending the Court's decision as most of the interested parties are present in this case.

[11] Lufthansa subsequently filed an amended complaint on November 2, 2010, which essentially alleged the same causes of action.  (*See* Dk. No. 9.)  On September 30, 2011, at the Court's direction, Lufthansa filed its Second Amended Complaint (the "Complaint") which simply added Count IV for a declaratory judgment as to the duration of ownership of the Technology.  (*See* Dk. No. 187.)  That complaint is the operative pleading at this juncture.

[12] Crossclaims filed by Turnstone, Leabman, and Vivano against Wi-Sky were dismissed by joint stipulation on February 4, 2011.  (*See* Dk. No. 77.)

further claimed that Lufthansa conspired to cause contractual breaches and tortious interference with its business and contractual relations. Finally, Wi-Sky asserted that Lufthansa breached the Confidentiality Agreement. For the conspiracy, tort, and breach of contract claims, Wi-Sky seeks monetary damages.

On November 11, 2010, Wi-Sky filed a motion to dismiss based on this Court's alleged lack of jurisdiction. It claimed that none of the events leading up to the creation of the IRA occurred in Virginia; therefore, the Court had no subject matter jurisdiction and was bound by the Georgia forum selection clause in the Agreement. The Court disagreed, memorializing its reasoning in a March 9, 2011 opinion. (*See* Dk. No. 110.)

Thereafter, the Court scheduled a March 16, 2011 hearing date on newly filed cross-motions for summary judgment from Lufthansa and Wi-Sky; a bench trial was set for March 22, 2011. (*See* Dk. Nos. 80, 81.) Following oral argument on the cross-motions, the Court indicated, *inter alia*, its intent to grant summary judgment in Wi-Sky's favor on the Technology ownership issue.[13] Subsequently, motions for reconsideration were filed by Lufthansa and True Path (Dk. Nos. 158, 166), and the Court heard argument on May 9, 2011, taking both motions under advisement. Since that time, the parties have engaged in extensive settlement negotiations

---

[13] More specifically, the Court informed the parties of its intent to grant summary judgment in Wi-Sky's favor on Count VII of Wi-Sky's counterclaim (Dk. No. 67) as well as True Path's crossclaim (Dk. No. 15), and dismiss Count III (Action for Declaratory Judgment) of Lufthansa's First Amended Complaint (Dk. No. 9). Additionally, the Court intended to deny Wi-Sky's motion for summary judgment (Dk. No. 80) as to Counts I and II of Lufthansa's First Amended Complaint because material facts remained in dispute regarding the critical issues raised in those claims. Finally, the Court intended to grant Lufthansa's motion for summary judgment on Counts I-VI of Wi-Sky's counterclaim (Dk. No. 81), dismissing each of them.
Given the Court's oral ruling, the remaining claims were Count I and II of Lufthansa's First Amended Complaint.

with the exceptional assistance of Magistrate Judges Dennis Dohnal and David Novak. This Court, anticipating settlement, delayed its written ruling for several months.

During that time period, the Court engaged in extensive deliberation concerning the issues raised in the original summary judgment motions and those for reconsideration. The Court has concluded that its March 16, 2012 oral ruling on the declaratory judgment issue must be vacated in the interest of justice.

Pursuant to the Court's September 21, 2011 order, the parties were granted leave to file supplementary motions for summary judgment on the enforceability of the Invention Rights Agreement. (*See* Dk. No. 186.) The Court also granted Lufthansa's motion to amend or correct its First Amended Complaint.[14]  On September 30, 2011, Lufthansa filed its Second Amended Complaint.   True Path and Lufthansa filed summary judgment motions related to IRA enforceability on October 13, 2011.  Lufthansa seeks summary judgment on Count III of the Complaint; True Path moves for summary judgment on Count I of its crossclaim.  In response, Wi-Sky filed the aforementioned discovery motions. (*See* Dk. Nos. 195, 198.)

### III. STANDARD OF REVIEW

Under Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant inquiry in a summary judgment analysis is "whether

---

[14] Additionally, in its September 21, 2011 order, the Court denied Wi-Sky's motion for summary judgment on all grounds given the Court's decision to reconsider its March 16, 2011 oral ruling and allow the plaintiff to amend the First Amended Complaint. The Court also granted leave to Wi-Sky to amend and re-file its summary judgment motion. Furthermore, Lufthansa's summary judgment motion was denied as to Count III (Action for Declaratory Relief) and granted as to Counts I-VI of Wi-Sky's counterclaim for breach of the confidentiality agreement, conspiracy, tortious interference, punitive damages and attorneys' fees/costs (the "Counterclaim"). Finally, the motions for reconsideration filed by True Path and Lufthansa were denied as moot given the Court's rulings concerning the amendment of pleadings.

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. Summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

Furthermore, pursuant to Virginia's choice of law rules, the Court will apply the law of the state in which the contract at issue was executed. *Black v. Power*, 628 S.E.2d 546, 554 (Va. Ct. App. 2006). The Invention Rights Agreement was executed in Georgia and the parties intended for Georgia law to govern any disputes: "[The IRA] shall be governed by and

12

construed in accordance with the laws of the State of Georgia without regard to conflict of laws rules." (IRA ¶ 13.)

## IV. DISCUSSION

In short, the Inventions Rights Agreement is not so ambiguous or undefined as to render it unenforceable. Nor is parole evidence necessary to interpret the Agreement and determine the intention of the contracting parties. Rather, the parties were explicit in stating that Leabman's role was to create a marketable, ground-to-air radio system for the benefit of Wi-Sky's business. Wi-Sky obtained the rights to only those concepts and inventions that Leabman and Vivano created for Wi-Sky at Wi-Sky's expense. As such, the rights to Leabman's prior inventions and designs concepts were not transferred with the IRA's execution.

Applying the proper rules of construction, the Court finds that the Inventions Rights Agreement is an enforceable contract based on its explicit, unambiguous language. Paragraph 5 of the IRA clearly supports the preservation of Leabman's rights in his prior inventions, and the Court's interpretation comports with the true essence of the business deal the parties intended to create. The Court's finding does not, however, resolve the questions of what Technology was created after the IRA's signing and the specific timetable of Wi-Sky's ownership of the Technology created post-execution. Such inquiries are properly reserved for trial.

### A. <u>Enforceability of the Invention Rights Agreement</u>

"The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon." *See e.g., Kueffer Crane & Hoist Serv., Inc. v. Passarella*, 247 Ga. App. 327, 330 (2000) (quoting *Demer v. Capital City Cable, Inc.*, 190 Ga. App. 40, 43 (1989)); *accord Jimenez v. Gilbane Bldg. Co.*, 303 Ga. App. 125, 129 (2010) (holding that the contracts terms were impossible to interpret and that the rules of

construction did not clarify the contract's meaning); *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (2009) (enforcing a contract which constituted a meeting of the minds and clear intent to be legally bound, despite the fact that it did not cover less material aspects of the agreement, such as tax consequences); *Key v. Naylor, Inc.*, 268 Ga. App. 419, 422-23 (2004) (holding that three contradictory terms in an employment contract made the term of the contract, an essential term, impossible to ascertain and rendered the contract unenforceable).   It is unnecessary that a contract state definitively and specifically all facts in detail to which the parties may be agreeing, but it will be  sufficiently definite and certain if it contains matters which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves. *Passarella*, 247 Ga. App. at 330. "[T]he cardinal rule of contract construction is to ascertain the intention of the parties." *Holcim, Inc. v. AMDG, Inc.*, 265 Ga. App. 818, 820 (2004)); *Sharple v. AirTouch Cellular of Georgia*, 250 Ga. App. 216, 218 (2001).

When a contract contains no ambiguity, a court must enforce the agreement as a matter of law according to its clear terms. *Ben Farmer Realty, Inc. v. Owens*, 286 Ga. App. 678, 680 (2007).  No construction is necessary. *See Caswell v. Anderson*, 241 Ga. App. 703 (2000). Contract language is unambiguous if it is capable of only one reasonable interpretation. *Id.* at 703.   When a contract is unambiguous, parol and extrinsic evidence is not admissible to contradict or construe the contract. *Safe Shield Workwear, LLC v. Shubee, Inc.*, 296 Ga. App. 489, 501 (2009).

If an apparent ambiguity exists, the trial court must seek to resolve the ambiguity through the application of the rules of construction. *Sheridan v. Crown Capital Corp.*, 251 Ga. App. 314, 315 (2002).  Under the rules of construction, the goal is to "ascertain the intent of the parties."

*Id.* at 315. A contract "must be construed as a whole rather than in separate and district parts, giving effect to all terms." *Id.* at 317. A contract should not be determined by examining isolated clauses and provisions. *Id.* This rule reflects the "well-settled . . . policy of the law . . . against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties." *McLean v. Continental Wingate Co.*, 212 Ga. App. 356, 358 (1994). In other words, courts are encouraged to construe a contract as binding on both parties because "the law will not construe a contract so as to give one party the right to destroy it by a simple refusal to comply with it." *Id.* (quoting *Finlay v. Ludden & Bates So. Music House*, 105 Ga. 264 (1898).

Here, Lufthansa and True Path claim that the IRA is simply an "agreement to agree" with no meeting of the minds on certain essential terms. They focus on three allegedly essential aspects of the IRA left undefined: (1) the future price of the airborne radios designed by Leabman and Vivano; (2) the non-recurring engineering ("NRE") costs of creating the custom radio; and (3) the timeframe over which Wi-Sky was obligated to provide the NRE.[15] On this issue, the Court disagrees. Georgia courts have consistently recognized that each and every term of the contract need not be stated with clarity and definiteness. *See e.g., Dye v. Mechanical Enterprises, Inc.*, 308 Ga. App. 311, 314 (2011).

---

[15] To the extent that Lufthansa and True Path challenge the enforceability of the Invention Rights Agreement based on other "essential," yet undefined, terms or for other alleged ambiguities in the contract, the Court rejects such arguments. Sophisticated parties negotiated the IRA, provided for mutual consideration, and signed it voluntarily. Importantly, the Court declines to address any allegations of securities fraud or fraudulent misrepresentations concerning the value of the consideration in this case. As noted during the Court's March 16, 2011 hearing, issues of fraud or breach of contract are not before the Court: "The value of the stock in this case is not really an issue that would preclude performance of the agreement." (Transcript, 3/16/11 Hearing, at 159).

As previously stated, the IRA provides for specific consideration, 50,000 shares of Wi-Sky stock, in exchange for the development of a custom radio by Leabman and Vivano.[16]  The fact that the timeframe, production costs, and sale price of the radios were left undetermined in the Agreement is entirely congruent with the nature of the business deal.  The Invention Rights Agreement was a development contract—Leabman would use his design and engineering expertise to develop the commercial product; Vivano would produce the final product in bulk; and Wi-Sky would act as the funding and marketing agent for the scheme.  At the time of the IRA's execution, the parties could only make an educated guess as to how much time and capital were necessary for the project.  Such determinations hinged on Leabman's future financial needs and any difficulties experienced in the creative process.  Understandably, the final price and release date could not be stated with particularity at the outset.

In sum, the business deal at issue involved sophisticated parties who negotiated the IRA, provided for mutual consideration, and signed it voluntarily.  It must be enforced, and the summary judgment motions filed by Lufthansa and True Path must be denied.  Additionally, the Agreement, although poorly-worded, contains explicit language that answers the underlying question in this case: what ownership rights did Leabman transfer when he executed the IRA.  In this Court's view, the answer to that question is clear and unambiguous.

As a matter of law, therefore, the Court finds that the Technology Leabman created for Wi-Sky's benefit, post-signing of the IRA is owned by Wi-Sky.  Leabman and Vivano (and True Path as the assignee) maintain all of their rights to any concepts and Technology developed prior to the Agreement's execution.

---

[16] In total, Leabman and Vivano eventually received 200,000 shares of Wi-Sky stock, pursuant to a Common Stock Agreement and Term Sheet that acknowledged the stock in lieu of cash agreement.  Wi-Sky also alleges that it provided a total of $1.3 million to Leabman and Vivano towards raw materials and the creation of the custom radio.

## B. <u>Transfer of Technology under the IRA</u>

The Court's analysis of the Invention Rights Agreement begins and ends with the capitalized, introductory provision to paragraph 5, entitled "Inventions and Intellectual Property Rights." It states:

> THE PROVISIONS OF THIS SECTION (5) APPLY ONLY TO WORK OF [sic] EFFORT DONE BY CONTRACTOR PERTAINING TO THE UNIQUE APPLICATION FOR GROUND-TO-AIR COMMUNICATION, **FOR THE BENEFIT OF AND PAID FOR BY WI-SKY**. THE PROVISIONS OF THIS SECTION DO NOT APPLY TO WORK OF CONTRACTOR THAT DO NOT PERTAIN TO, RELATE TO, APPLY TO, OR BENEFIT THE GROUND-TO-AIR COMMUNICATION MISSION OF WI-SKY.

(IRA ¶ 5 (emphasis added).) The phrase "for the benefit and use of Wi-Sky" is repeated several times in the Agreement, notably in paragraph 2 when discussing the type of technical matters that are "Confidential Information." (*See* IRA ¶¶ 2, 5(a).) The parties thereby made clear that the basis of the contract bargain was forward-looking. Leabman was receiving compensation for his new role as CTO of the company—one that required him to make certain technological developments *for Wi-Sky, at its direction and expense*. He was not forfeiting his entire body of work in the ground-to-air communication arena.[17]

Leabman was hired based on the theories and expertise he demonstrated in these previous concepts and inventions. The IRA encompassed the next step: a commercial, ground-to-air radio system that could be sold to major airline companies. At the time of the Agreement's execution, no system existed. Leabman was employed by Wi-Sky to develop off-the-shelf parts into a

---

[17] It is an undisputed principle of law that Leabman may assign to Wi-Sky his intellectual property, "in whole or in part." 35 U.S.C. § 261 ("Applications for patent, patents, or any interest therein, shall be assignable by law in an instrument in writing."); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135 (1969).

marketable product.  Because of funding issues, production was halted, and Leabman left Wi-Sky in search of other backing companies.[18]

Wi-Sky's primary argument in response to the capitalized, introductory language centers on the phrase "now has made, conceived, or developed" in the IRA's definition of "Inventions" (IRA ¶ 5(a).)   In full, "Inventions" are defined as: "all inventions, proprietary ideas, copyrightable material, designs, improvements and discoveries of any kind whether hardware or software which Contractor [Leabman] now has made, conceived, or developed, or which contractor may later make, conceive or develop, during the period of Contractor's engagement with Wi-SKY, which pertain to, apply to, relate to, or benefit Wi-SKY's business, inflight communication mission, patents, patents pending or business model or any of the work or businesses carried on by Wi-SKY."[19]   (*Id.*)  The Agreement further provides that "[Leabman] hereby assigns all Contractor's rights in all Inventions and in all related patents, copyrights, trademarks, trade secrets and other proprietary rights therein to Wi-SKY."  (*Id.*)  Nevertheless, it concludes: "This Agreement applies to all such Inventions . . . *for the benefit and use of Wi-SKY.* Inventions expressly excludes radio chips, components, processes, or applications which are not specific to inflight communication with aircraft."  (*Id.* (emphasis added))

The Court recognizes the potential ambiguity that the phrase "now has made, conceived, or developed" presents in its interpretation of the IRA.  Yet, the Court rejects Wi-Sky's argument for two reasons.  First, the Court is guided by the prevalence and relative importance of

---

[18] The issue of whether Leabman and Vivano breached the Invention Rights Agreement is not before this Court, and the Court makes no judgments or assessments of such a claim.

[19] Paragraph 5(b) of the Agreement provides "[i]nventions, as defined herein, and subject to the obligation timetable set forth in Appendix A, shall be the sole and exclusive property of Wi-SKY . . . ."  (IRA ¶ 5(b).)

provisions in the Agreement which recognize that "Inventions" encapsulated only those things made for Wi-Sky's benefit. These statements are found in paragraph 2 of the Agreement as well as three separate times in paragraph 5. (*See* IRA ¶ 2, 5.)

Second, the rules of construction dictate that the Court should prioritize the provisions of the contract in favor of Lufthansa's interpretation (as well as that of Leabman, Vivano, and True Path). *Chaudhuri v. Fannin Regional Hosp.*, No. A12A0100, 2012 WL 2819429, at *1 (Ga. Ct. App. July 11, 2012) ("If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of contract construction set forth in OCGA § 13–2–2.").[20]   Examining the

---

[20] Under Georgia law, "[t]he following rules, among others, shall be used in arriving at the true interpretation of contracts:

> (1) Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing (such as a note given in pursuance of a contract) and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible;
> (2) Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties;
> (3) The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, except in regard to those transactions covered by Title 11;
> (4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part;
> (5) If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred;
> (6) The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied;
> (7) When a contract is partly printed and partly written, the latter part is entitled to most consideration;
> (8) Estates and grants by implication are not favored; and

contract as a whole and affording the words used therein their plain and ordinary meaning, the Invention Rights Agreement is capable of only one reasonable interpretation: Leabman was employed to create a product using his technological expertise for the benefit, and at the expense, of Wi-Sky. *See Capital Color Printing, Inc. v. Ahern*, 291 Ga. App. 101, 106 (2008); *Quality Foods v. Smithberg*, 288 Ga. App. 47, 51 (2007). This principle is "front-and-center," capitalized, and explicit. The intention of the parties is evident.[21]

Moreover, under general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive. *See Central Ga. Elec. Membership Corp. v. Ga. Power Co.*, 217 Ga. 171, 173-74 (1961). The introductory section to paragraph 5 is clearly and purposefully more specific in comparison to the undefined ambiguity of "now has made, conceived, or developed." As such, the Court must favor the interpretation proffered by Lufthansa and True Path. *See Triple Eagle Assocs. v. PBK, Inc.*, 307 Ga. App. 17, 24 (2010) ("'The construction of a particular phrase that will uphold a contract in its entirety is preferred, and the entire contract must be looked at in the construction of any of its parts.'") (quoting *Kreimer v. Kreimer*, 274 Ga. 359, 361 (2001)).

---

(9) Time is not generally of the essence of a contract; but, by express stipulation or reasonable construction, it may become so."

O.C.G.A. § 13-2-2.

[21] Of note, Leabman sent an email to Grant Sharp on January 26, 2009 that essentially states: "I trust you will give us relief to use the strip for other applications that aren't ground-to-air." The email was referenced and relied upon by this Court in its March 16, 2011 oral ruling. Upon further consideration, however, the Court has concluded that the email comports with the Court's current understanding of the Invention Rights Agreement. Leabman planned to develop and create a product for Wi-Sky to use in its ground-to-air business. To protect his interests, Leabman sent the email to ensure the preservation of his ability to market the product and technology to providers of other forms of transportation. As such, the email is unhelpful to Wi-Sky's theory of the IRA.

Finally, even accepting some ambiguity in the contract provisions, Georgia courts have spoken: "[I]n the event of an irreconcilable conflict in the provisions of a contract[,] the provision first set forth in the contract prevails." *See Wilner's, Inc. v. Fine*, 153 Ga. App. 591, 594 (1980)); *accord Coker v. Coker*, 265 Ga. App. 720, 722 (2004) ("It is a well-established rule in the construction of contracts that in the event of such a conflict, the first provision prevails."); *see also Hardman v. Dahlonega-Lumpkin Cnty. Chamber of Commerce*, 238 Ga. 551, 553 (1977); *Barge & Co. v. City of Atlanta*, 161 Ga. App. 675, 678 (1982); *Garner v. Metro. Life Ins. Co.*, 152 Ga. App. 242, 243 (1979); *Atlanta Biltmore Hotel Corp. v. Martell*, 118 Ga. App. 172, 175 (1968); *Whitney v. Hagan*, 65 Ga. App. 849, 85 (1941). Viewing the contract as a whole, where there are conflicting provisions, "[t]he clause contributing most essentially to the contract is entitled to the greater consideration. . . ." 17A C.J.S. Contracts § 309, p. 163. In this case, the Court finds that the capitalized, introductory provision that limits "Inventions" to only those things created for Wi-Sky's benefit at its expense encapsulates the essence of the Agreement and true intention of the contracting parties. The section is also the first and more specific of the two at issue.

Accordingly, the Court finds in favor of the IRA interpretation proffered by Lufthansa and True Path. Leabman's prior inventions and intellectual property were not transferred with the Agreement's execution; instead, Wi-Sky inherited the rights to all concepts and inventions developed after the signing.

## V. CONCLUSION

For those reasons, the Court will deny the motions for summary judgment filed by Lufthansa and True Path. Furthermore, the Court finds that the Invention Rights Agreement explicitly provides that all of Leabman's prior inventions and intellectual property were not

transferred upon the signing of the Agreement.  This case will be set for trial on the issue of what

exact Technology was developed post-IRA execution and the timetable for Wi-Sky's ownership

over those inventions and intellectual property.

    An appropriate order shall issue

Date: <u>August 17, 2012</u>
Richmond, VA

                /s/
                John A. Gibney, Jr.
                United States District Judge